M. Murray VAN DE VELDE, Ernest Van Den Haag, Donald Delliquanti, H. Paul Lasky, Pearl Ladenheim, Richard A. Pitino, Ruth Bommer Rosenstein, and Tarek Kettaneh, Plaintiffs,

v.

COOPERS & LYBRAND, Defendant.

Civ. A. No. 94–11616 PBS.

United States District Court, D. Massachusetts.

June 23, 1995.

---

Thomas G. Shapiro, Boston MA, Stephen V. Saia, Boston, MA, for plaintiffs.

Peter M. Casey, Boston MA, Michael A. Albert, Boston MA, Mary Jo Montagnino, Gloucester MA, for defendant.

## MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION TO DISMISS

SARIS, District Judge.

This is a class action for securities law and state common law violations brought by certain shareholders of Ferrofluidics, Inc., against Ferrofluidics' auditor, Coopers & Lybrand, arising out of alleged accounting improprieties in Ferrofluidics' financial statements for fiscal year 1992 ("FY 92"). Defendant moves to dismiss the complaint, mainly on the grounds that it inadequately pleads the element of scienter essential to a claim under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ("section 10(b)"). After reviewing the nationwide case law involving securities suits against auditors, this court concludes that the primary section 10(b) claim is adequately pled. The court agrees with defendant, however,

that the secondary securities law claim and the state law claims must be dismissed.

## BACKGROUND

In ruling on a motion to dismiss for failure to state a claim, the court of course takes all well-pled allegations as true, drawing all reasonable inferences in the plaintiff's favor. *See, e.g., Feinstein v. RTC,* 942 F.2d 34, 37 (1st Cir.1991) (citing cases). The facts alleged by plaintiffs are as follows.

Ferrofluidics is a Massachusetts corporation which applies magnetic fluid technology to a variety of processes, including the manufacture of stereo speakers and hard disk drives. Ferrofluidics did not have a formal written revenue recognition policy and recognized revenue upon "delivery" of its systems to its customers. It improperly recognized revenue from two sales on or about June 27, 1992. The first sale involved four crystal growing systems valued at $4.33 million, designed for Posco Huls Co., Ltd., and for a firm hired by Posco Huls to provide additional technology, MEMC Electronic Material, Inc. One unit was delivered to MEMC's site in May, 1992. After installation of the first unit, Posco Huls/MEMC requested a laundry list of engineering changes involving all units. The second sale involved crystal growing equipment valued at $570,000, designed for Toshiba, Inc.

Concerned about the propriety of recognizing revenue from these transactions, the auditor urged Ferrofluidics to obtain statements from the customers that the systems were "accepted," but being held at the Ferrofluidics facility at their request. MEMC obliged with the following statement, in a letter dated August 21, four days after the date of the contested audit opinion.

> [The systems] were complete at Ferrofluidics location for purposes of invoicing.... This in no way, however, affects the payment terms for said systems as detailed in the purchase contract.... Due to [the] complex nature of the systems and need to minimize the need to rework them for subsequent design changes once they are installed at our facility, it was in the best interest of all parties to keep the systems at Ferrofluidics' plant until all

technical discussions and training are completed.

Compl. ¶ 39. The Performance Cancellation Clause in the Posco Huls/MEMC purchase order provides: "By 3/3/92 or 30 days after delivery of the first unit, if a unit does not operate per specification [at MEMC], Ferrofluidics will refund 100% of the payment.... to date." The first unit had been delivered by May, 1992.

For its part, Toshiba refused to provide any statement remotely suggesting that its purchase had been "accepted." Furthermore, at the end of FY 92 or the beginning of FY 93, Toshiba inspected its ordered equipment at the Ferrofluidics facility and requested design changes. Ferrofluidics' Chief Financial Officer discussed these requested changes with the auditor.

Plaintiffs allege that the company violated accepted accounting practices in two respects. First, Ferrofluidics violated Accounting Practice Board ("APB") Opinion 22, in neglecting to disclose in the notes to its financial statements its policy for determining earned revenue. (Compl. ¶ 43).

Second, the company failed to satisfy the criteria for revenue recognition under any of the three methods conceivably acceptable under the circumstances: the method of Financial Accounting Standard Board Statement No. 48, used when the contract establishes a right of return; the "bill and hold" method; and the "completed-contract" method of APB Opinion 10. Compl. ¶¶ 25–28). None of these methods could be satisfied, because the sales were "either subject to financial, performance, acceptance or other contingencies that were not satisfied, and/or the equipment was not substantially complete at the time Ferrofluidics recorded the sale." (Compl. ¶ 29).

Nonetheless, Coopers & Lybrand wrote an unqualified audit opinion, dated August 17, 1992, and filed with the SEC on September 28, 1992, certifying that, after conducting an audit in compliance with Generally Accepted Accounting Standards ("GAAS"), it had a reasonable basis for the opinion that Ferrofluidics' financial statements for FY 92 com-

plied with Generally Accepted Accounting Principles ("GAAP").

During the following year, an SEC investigation focusing on the Posco Huls/MEMC and Toshiba sales led, in turn, to the publication of revised financial statements for FY 92, a severe market correction, and the departure of Ferrofluidics' two top executives. In its audit opinion for FY 93, Coopers withdrew its opinion for FY 92, stating that in light of the executives' departures, "we believe we can no longer rely on their representations nor can we be certain that we have been provided with all appropriate documentation relevant to the transactions which they initiated or for which they were responsible."

## DISCUSSION

### A. *Violations of Section 10(b)*

██ To state a claim for a direct violation of section 10(b), a plaintiff must allege (1) a misrepresentation or omission of a material fact in connection with the purchase or sale of a security; (2) scienter; (3) reliance/causation; and (4) damages. *See, e.g., Basic v. Levinson*, 485 U.S. 224, 230–32, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988).

### 1. *Scienter*

██ Defendant maintains that plaintiffs have failed to meet the stringent pleading requirement of Fed.R.Civ.P. 9(b). The implications of Rule 9(b) for the pleading of scienter has been stated by the First Circuit as follows: "[G]eneral averments of the defendants' knowledge of material falsity will not suffice.... Consistent with Fed.R.Civ.P. 9(b), the complaint must set forth 'specific facts that make it reasonable to believe that defendant *knew* that a statement was materially false or misleading.'" *Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 361 (1st Cir.1994) (emphasis added) (citations omitted).

### a. *Case Law*

██ Nearly twenty years ago, the Supreme Court left open the question whether the scienter requirement of section 10(b) can be satisfied by a showing of recklessness. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 1380, 47 L.Ed.2d 668 (1976). Since *Hochfelder*, it has become widely accepted in the lower courts that "recklessness" is sufficient to satisfy the scienter requirement of § 10b and Rule 10b–5. *See Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568 n. 6 (9th Cir.1990) (collecting cases from 10 circuits), *cert. denied*, 499 U.S. 976, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991). This Circuit has characterized a reckless misrepresentation as "one that departs so far from the standards of ordinary care that it is very difficult to believe that the speaker was not aware of what he was doing." *First Commodity Corp. v. Commodity Futures, Trading Com'n*, 676 F.2d 1, 7 (1982) (pointing out that reckless behavior is sufficient to incur liability under SEC Rule 10b–5).

A useful recitation of the recklessness standard in the present context is the following:

> " 'Recklessness' in a securities fraud action against an accountant is defined as 'highly unreasonable [conduct], involving not merely simple, or even excusable negligence, but an extreme departure from the standards of ordinary care, and which presents *a danger* of misleading buyers or sellers *that is either known* to the defendant *or is* so obvious that the actor must have been aware of it.' That standard requires more than a misapplication of accounting principles. The [plaintiff] must prove that the accounting practices were so deficient that the audit amounted to no audit at all, or '*an egregious refusal to see the obvious, or to investigate the doubtful,*' or that the accounting judgments which were made were such that no reasonable accountant would have made the same decision if confronted with the same facts."

*SEC v. Price Waterhouse*, 797 F.Supp. 1217, 1240 (S.D.N.Y.1992) (emphasis added) (citations omitted).

The notion that "an egregious refusal to see the obvious, or to investigate the doubtful" gives rise to inference of recklessness is a recurrent refrain in the case law. *See, e.g., In re Software Toolworks, Inc.*, 50 F.3d 615, 627 (9th Cir.1994); *In re Worlds of Wonder Securities Litigation*, 35 F.3d 1407, 1426 (9th Cir.1994), *petition for cert. filed* (June 12,

1995) (No. 94–2027); *Friedman v. Arizona World Nurseries, Ltd.*, 730 F.Supp. 521, 532 (S.D.N.Y.1990), *aff'd*, 927 F.2d 594 (2d Cir. 1991) (table) (9th Cir.1994); *Goldman v. McMahan, Brafman, Morgan & Co.*, 706 F.Supp. 256, 259 (S.D.N.Y.1989). *See also Frymire–Brinati v. KPMG Peat Marwick*, 2 F.3d 183, 191 (7th Cir.1993) ("A jury may conclude that an auditor's failure to check on anything he is told not only falls short of GAAS but also reflects such indifference to truth as to be reckless."); *Fine v. American Solar King Corp.*, 919 F.2d 290, 297 (5th Cir.1990) (" 'a conscious purpose to avoid learning the truthfulness of a statement is an extreme departure from the standards of ordinary care' "), *cert. dismissed*, 502 U.S. 976, 112 S.Ct. 576, 116 L.Ed.2d 601 (1991); *Ades v. Deloitte & Touche*, 799 F.Supp. 1493, 1500 (S.D.N.Y.1992) (auditor's motion to dismiss denied where "facts which, taken together, suggest that [the auditor] had reason to suspect a problem with the accounting of [a particular] Sale, rais[ed] the auditor's] failure to investigate further from mere negligence to reckless disregard"); *C–L Alexanders Laing & Cruickshank v. Goldfeld*, 739 F.Supp. 158, 163 (S.D.N.Y.1990) ("recklessness connotes defendant's knowledge that it does not have sufficient basis to speak"); *Estate of Detwiler v. Offenbecher*, 728 F.Supp. 103, 137 (S.D.N.Y.1989) ("method of preparation" of financial statements may be "so egregious as to render [the] dissemination reckless").

■  One generality that emerges from a study of the treatment of similar motions to dismiss is that a well-pled section 10(b) claim against an auditor will specify the improper transactions, the standards violated, and the manner of violation. *Compare Adam v. Silicon Valley Bancshares*, Fed.Sec.L.Rep. (CCH) ¶ 98,525, at 91,561, 884 F.Supp. 1398 (N.D.Cal. Jan. 9, 1995) (auditor's motion to dismiss denied where complaint identified problematic transactions, and specified how the failure to take appropriate actions violated specific accounting standards) *with DiLeo v. Ernst & Young*, 901 F.2d 624, 626 (7th Cir.1990) (affirming dismissal of section 10(b) suit against auditor because complaint did not "give examples of problem loans that [the auditor] should have caught, or explain how

it did or should have recognized that the provisions for reserves established by the [audited bank's] loan officers were inaccurate"); *In re One Bancorp Securities Litigation*, 135 F.R.D. 9, 12 nn. 8–9 (D.Me.1991) (dismissing complaint against auditor for failure to indicate manner in which GAAP and GAAS were violated); *Breckley v. Amway Corp.*, Fed.Sec.L.Rep. (CCH) ¶ 94,736, at 93,-970, 1989 WL 140397 (D.S.C.1989) (dismissing complaint against auditor for failure to designate any specific accounting principles violated). Needless to say, the section 10(b) claim against an auditor will also be dismissed if the allegations of scienter are merely conclusory. *See Melder v. Morris*, 27 F.3d 1097, 1104 (5th Cir.1994); *Ades v. Deloitte & Touche*, 1991 WL 126043 (S.D.N.Y. 1991); *Goldman v. McMahan, Brafman, Morgan & Co.*, 706 F.Supp. 256, 259 (S.D.N.Y.1989).

### b. *Red Flags*

■  Plaintiffs point to the following five "red flags" that they say should have signalled to the auditor—at the time of the FY 92 audit—that the Posco Huls/MEMC and Toshiba deals were out of the ordinary. (1) Revenue from the two deals was recognized three days before the end of the fiscal year, and the revenue was substantial—spelling the difference between a six cent per share loss and an 83 cent per share gain, for that year. (2) The equipment from these transactions remained visibly present on Ferrofluidics' manufacturing floor during the audit. (3) Recognition of the revenue from these deals before delivery violated Ferrofluidics' own (undeclared) revenue recognition policy. (4) The letter of "acceptance" obtained from MEMC was at best equivocal—with its reaffirmation of the contract terms (including the "performance cancellation payment" clause), and its implication that the ordered systems were not yet complete. (5) Toshiba refused altogether to provide a letter confirming "acceptance" of the goods ordered.

Plaintiffs accurately observe that a complaint will usually survive a motion to dismiss if plaintiffs have alleged the existence of "red flags" sufficiently attention-grabbing to have alerted a reasonable auditor to the audited

company's shenanigans. A few such cases even contain "red flags" analogous to those alleged in this case. *See Spear v. Ernst & Young,* Fed.Sec.L.Rep. (CCH) ¶ 98,399, at 90,741, 1994 WL 585815 (D.S.C.1994) (section 10(b) claim against auditor properly pled where auditor, *inter alia,* approved corporation's recognition of revenue from contracts for which side letters allowed customers a unilateral right of cancellation); *Ades,* 799 F.Supp. at 1500 (section 10(b) claim against auditor properly pled where, *inter alia,* improperly accounted sale was booked on the last day of the fiscal year and constituted 20% of the company's accounts receivable for the year); *see also In re Sweeney,* AAER No. 619 (CCH) ¶ 74,079, at 63,485 (October 24, 1994) (SEC disciplinary ruling against auditor, noting that red flags include transactions unsupported by documentation, and unusual transactions completed at or near year end). *Cf. Ades v. Deloitte & Touche,* 1992 WL 6142 (S.D.N.Y.1992) (complaint dismissed for failure to plead facts establishing that auditor should have been aware of accounting violations). *See also In re Software Toolworks, Inc.,* 50 F.3d at 629 (granting summary judgment on the grounds that plaintiffs failed to establish that the auditor was reckless in approving the improper recognition of revenue, despite evidence that the sales agreements were poorly documented and risky, that management was under heavy pressure to generate favorable earnings, that the auditor obtained only oral confirmations of some agreements, and that the auditor deviated from its audit plan, but denying it on the counts where the evidence directly showed the auditor to have had access to information contradicting the financial statements).

Defendant attempts to put a different spin on the facts by pointing out that the auditor reviewed the two questionable transactions and discussed them with Ferrofluidics' executives, and the complaint is devoid of allegations that Coopers was given any specific information that would lead it to believe that revenue was improperly recognized. Defendant also gives a more benign interpretation to the MEMC letter of August 21, and argues that, given the conditions of the "performance cancellation clause," the auditor would have had no reason to believe that the clause might be triggered. To be sure, a negative inference could be drawn from the fact that the complaint does not make certain allegations that would make the inference of scienter much easier; and both the MEMC letter and the "performance cancellation clause" are subject to interpretation. But defendant forgets that, at this stage in the proceedings, the court is obligated to construe the facts in the light most favorable to the plaintiffs. *See, e.g., Feinstein, supra.* Which party's view of the facts would be vindicated by a complete examination of the record remains an open question.

Defendant does make three legitimate points that go directly to what this courts sees as the crux of the matter—the contextual determination of "recklessness." First, defendant points out that the two questionable transactions *were* eventually completed. As another court put it, "[T]he fact that income was fully realized from the transactions for which plaintiffs claim revenue was recognized early negates an inference of scienter. The deals were 'real deals'—the transaction closed and [the company] was paid." *Provenz v. Miller,* 1994 WL 485925, at *3 (N.D.Cal.1994). However, the *Provenz* court, which was ruling on a motion for summary judgment, went on to find it noteworthy that the record was "essentially void of evidence" suggesting that the company audited "had not earned the revenue by the dates on which it was recognized or . . . had not substantially accomplished what it had to do to be entitled to the benefits represented by the revenue." *Id.* The same cannot be said here.

Second, defendant argues that its after-the-fact retraction of its unqualified audit opinion tends to indicate that it had no guilty knowledge at the time the opinion was issued. *See Griffin v. McNiff,* 744 F.Supp. 1237, 1250 (S.D.N.Y.1990) (Allegations that auditor withdrew prior opinion letters based on newly discovered information "simply do not support a strong inference of scienter. If anything, they indicate exactly the opposite."), *aff'd,* 996 F.2d 303 (2d Cir.1993) (table). At least on the facts of this case, this court finds this argument unpersuasive: to

retract the opinion once its flaws became public knowledge would be the sensible thing to do whether or not the auditor was reckless at the time the opinion issued. In any event, this sequence of events certainly does not compel dismissal of the complaint. *See Spear,* Fed.Sec.L.Rep. ¶ 98,399, at 90,741 (auditor's motion to dismiss section 10(b) claim denied, although auditor withdrew unqualified opinions after the fact).

Defendant's final argument is that scienter has not been adequately pled because plaintiffs can point to no conceivable motive for its alleged approval of Ferrofluidics' slipshod accounting. As its chief supports, defendant cites one case from the Seventh Circuit and one from the Fifth Circuit. The Seventh Circuit stated in sweeping terms: " 'The plaintiff must [offer] some reason to conclude that the defendant has thrown in his lot with the primary violators.' " *DiLeo v. Ernst & Young,* 901 F.2d 624, 629 (7th Cir.1990) (Easterbrook, J.), *cert. denied,* 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990). Judge Easterbrook reasoned as follows: "An accountant's greatest asset is its reputation of honesty, followed closely by its reputation for careful work. Fees for two years' audits could not approach the losses [the auditor] would suffer from a perception that it would muffle a client's fraud." Similarly, abetting fraud would be irrational from the point of view of the individual partners and associates; and "indulging ready inferences of irrationality" is not something courts should do. *Id.*

The Fifth Circuit applied *DiLeo*'s motive analysis in the course of granting an auditor's motion to dismiss a section 10(b) claim. *Melder v. Morris,* 27 F.3d 1097, 1103 (5th Cir.1994). *Melder* flatly rejected the notion that an auditor's wish to profit from a continuing relationship with a client is a plausible motive. *Id.; accord Worlds of Wonder,* 35 F.3d at 1427 n. 7; *Price Waterhouse,* 797 F.Supp. at 1242 & n. 60 (S.D.N.Y.1992). Though the Fifth Circuit did not, like the Seventh, use language suggesting that a showing of motive may be required, it did indicate that in the absence of motive a stricter state of mind requirement will be imposed: "Since [the auditor]'s motive is not

apparent, the plaintiffs can allege scienter only under a more stringent standard under which they must plead particular circumstances indicating the firm's conscious behavior." *Id.* at 1104.

The First Circuit has not adopted a rule either outright requiring a showing of motive in order to plead scienter, or raising the pleading standard in the absence of a showing of motive. *See Serabian v. Amoskeag Bank Shares, Inc.,* 24 F.3d at 368 n. 21 (holding that plaintiffs had met the pleading requirements of section 9(b) without relying on allegations of motive to establish scienter). The majority view, though rarely stated in so many words, is that "[r]ecklessness does not require showing of motive." *Ades,* 799 F.Supp. at 1499 n. 6. To impose any sort of motive requirement would verge on converting the "recklessness" standard into an "actual intent" standard. It would be inconsistent with the large body of cases stating that recklessness in this context may be shown through an "egregious refusal to see the obvious, or to investigate the doubtful." *See supra* p. 734. Plaintiffs' failure to allege a plausible, unique motive for the auditor's conduct certainly weakens their showing of scienter, but not fatally.

Plaintiffs' allegations amply specify the flawed deals, the accounting norms violated, and the manner of violation. Of equal importance, plaintiffs have identified a number of "red flags" which—taken together, on the facts of this case—satisfy this court that a reasonable auditor would have become aware that the disputed transactions demanded special inquiry. The court concludes that plaintiffs have pled the scienter element of their section 10(b) claim with sufficient specificity to satisfy the strictures of Fed.R.Civ.P. 9(b).

*2. Causation*

■ The other element of a section 10(b) violation over which the parties skirmish is causation. Defendant dwells on the fact the value of Ferrofluidics' stock did not decline immediately upon the heels of the corrective disclosures concerning FY 92 on November 24, 1993. Plaintiff responds that the precipitous market drop in reaction to the September 3 and 7 announcements relating to Fer-

rofluidics' review of "certain other isolated transactions" must be considered in the causation analysis which begins at the point of purchase of the stock, not the date when the corrective disclosure is made. The court agrees that causation has been adequately pled, for reasons best stated by Judge Mazzone in rejecting a comparable argument on a motion to dismiss: The plaintiffs have "alleged that but for the defendants' false statements, [their] loss would not have occurred, and [they have] alleged a sequence of events which is plausible on its face. [They] need do no more at this stage of the proceedings." *Wells v. Monarch Capital Corp.*, Fed.Sec. L.Rep. (CCH) ¶ 96,892, at 93,667, 1991 WL 354938 (D.Mass.1991).

### B. *Secondary Violations of Section 10(b)*

■ In Para. 77 of the complaint, plaintiffs allege that "Coopers also conspired with Ferrofluidics to defraud plaintiffs and the Class through the issuance of materially false and misleading financial statements." To the extent that this constitutes a distinct claim for conspiracy to violate the securities laws, defendant is correct that this claim is barred by *Central Bank of Denver, N.A. v. First Interstate Bank, N.A.*, —— U.S. ——, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994).

*Central Bank* held that there is no cause of action for aiding and abetting a securities violation. *Id.* at ——, 114 S.Ct. at 1447. It would be "beyond logic to maintain that although *Central Bank* prohibits aiding and abetting liability it permits plaintiffs to maintain the same cause of action by labelling it a conspiracy." *In re Ross Systems Securities Litigation,* Fed.Sec.L.Rep. (CCH) ¶ 98,363, 1994 WL 583114 (N.D.Cal.1994). It is therefore unsurprising that a court in this district recently dismissed a claim for conspiracy to violate securities laws on the grounds that, after *Central Bank,* "only those who *make* a material statement or omission ... are subject to private suit under Section 10(b)." *In re Kendall Square Research Corp. Securities Litigation,* 868 F.Supp. 26, 28 (D.Mass.1994).

Plaintiffs make scant effort to salvage their apparent claim for conspiracy. Their principal point in rebuttal is that *Central Bank* does not preclude securities claims against secondary parties (such as accountants), so long as those parties have committed primary violations. *See, e.g., In re Software Toolworks,* 50 F.3d at 628 n. 3 (finding that auditor's participation in *drafting* misleading letters to SEC could support claim of primary securities liability). This point is well taken, but does not squarely address the argument made by defendant. There is no well-pled allegation here that Coopers directly participated in the preparation, review or approval of the Ferrofluidics' false and misleading statements. Any claim for conspiracy is hereby dismissed.

### C. *State Law Claims*

In addition to securities violations (Count I), the complaint alleges claims for common law fraud and deceit (Count II), and for negligent misrepresentation (Count III). Defendant correctly points out that the state law claims are inadequately pled.

■ A claim for fraud and deceit in Massachusetts should ordinarily be dismissed unless it pleads actual reliance by the named plaintiffs, because the "fraud on the market" presumption of reliance, though adopted in federal law by *Basic, Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), has not to date been embraced by the Supreme Judicial Court. *See Wells,* 1991 WL 354938 at *13. In response, plaintiffs cite Judge Harrington's opinion in *In re Bank of Boston Corp.,* 762 F.Supp. 1525 (D.Mass.1991). *Bank of Boston* declined to dismiss a claim for common law fraud before discovery was complete, in order to preserve the possibility that discovery would provide a factual basis for pleading direct reliance by the class representatives. *Id.* at 1536. *Bank of Boston* is fully consistent with defendant's and *Wells'* view on the status of the "fraud on the market" theory in Massachusetts; it differs only on the appropriate method of judicial management. In this case, as defendant observed at oral argument, most of the discovery has already been completed in the course of litigating a companion case. This circumstance makes it less likely that a factual basis for pleading direct reliance will suddenly come to light. It therefore makes most sense to dismiss Count II.

A claim for negligent misrepresentation must be dismissed if it fails to plead either privity between the parties, or actual knowledge by the defendant of the plaintiffs' reliance on the misrepresentations. *Rand v. Cullinet Software, Inc.,* 847 F.Supp. 200, 214 (D.Mass.1994); *Wells,* 1991 WL 354938 at *13; *Bank of Boston,* 762 F.Supp. at 1536–37. Plaintiffs' complaint pleads neither, and the plaintiffs offer no excuse in their briefs. Without further ado, Count III is therefore dismissed.

## ORDER

For the foregoing reasons, Defendant's Motion to Dismiss (Docket #9) is *ALLOWED* with respect to Counts II and III, and so much of Count I as asserts liability based on a conspiracy theory.