In re: **EAGLE BUILDING TECH-NOLOGIES, INC., SECURI-TIES LITIGATION**

No. 02–80294-CIV.

United States District Court,
S.D. Florida,
West Palm Beach.

Jan. 22, 2004.

See also 221 F.R.D. 582.

Adam Stephen Doner, Robert E. Gordon, Gordon & Doner, Palm Beach Gardens, FL, Peter Harold Rachman, Emily Cornelia Komlossy, Goodkind Labaton Rudoff & Sucharow, Hollywood, FL, Sandy A. Liebhard, Jeffrey M. Haber, Joseph R. Seidman, Bernstein, Liebhard & Lifshitz, New York City, Jack Reise, Geller Rudman, Neil S. Baritz, Baritz & Colman, Boca Raton, FL, Michael J. Pucillo, Wendy Hope Zoberman, Berman, DeValerio, Pease, Tabacco, Burt & Pucillo, West Palm Beach, FL, Leonard Barrack, Barrack, Rodos & Bacine, Philadelphia, PA, for Plaintiffs.

Scott Lawrence Cagan, Richard Aldo Serafini, Broad & Cassel, Jan Douglas Atlas, Adorno & Yoss, John R. Hargrove, Gordon, Hargrove & James, Fort Lauderdale, FL, Charlie B. Levy, North Miami Beach, FL, for Defendants.

## *ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT TANNER & COMPANY'S MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT WITH PREJUDICE*

RYSKAMP, District Judge.

THIS CAUSE comes upon Defendant Tanner & Company's ("Tanner") Motion to

Dismiss **[DE 94]** the Second Amended Class Action Complaint With Prejudice **[DE 88]**. This motion was filed on August 21, 2003. Plaintiffs responded **[DE 100]** on October 2, 2003, and Tanner replied **[DE 104]** on October 30, 2003. Per request **[DE 95]** by Tanner, this Court heard oral argument from the parties on January 9, 2004. This matter is now ripe for adjudication.

## I. Background

In order to effectively discuss the issues presented by Tanner's Motion, this Court must first set forth the factual and procedural background of this case and examine the changes made in the Second Amended Class Action Complaint. Each of these areas is discussed in turn.

### A. Factual and Procedural Background

This is a securities fraud class action brought on behalf of purchasers of Eagle common stock ("the Class") from November 21, 2000 through February 14, 2002 ("the Class Period"). Eight cases were filed in this Court by individuals who purchased stock during the class period. Plaintiffs brought suit against Defendants Eagle Building Technologies, Inc. ("Eagle"), a construction and manufacturing company; Anthony Damato and Paul–Emile Desrosiers, Eagle corporate officers; and Tanner, an accounting and consulting firm which audited Eagle's financial statements. On July 31, 2002, these cases were consolidated and lead plaintiff and lead counsel were appointed. Plaintiffs filed their Consolidated Amended Class Action Complaint **[DE 56]** on October 15, 2002. Tanner subsequently filed a motion to dismiss, which this Court granted **[DE 84]** on May 15, 2003. Plaintiffs then filed their Second Amended Class Action Complaint

("the Complaint") **[DE 88]** on July 3, 2003, and Tanner filed this second motion to dismiss.

In the first amended complaint, Plaintiffs alleged that all Defendants violated sections 10(b) of the Exchange Act and SEC Rule 10b–5. Plaintiffs stated that on April 18, 2001, Eagle filed its annual SEC report for the calendar year 2000, Form 10–KSB. Eagle management and Defendant Damato signed the form, and Tanner included the following statement:

> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Eagle Capital International, Ltd. as of December 31, 2000, and the results of its operations and its cash flows for the year then ended, in conformity with auditing standards generally accepted in the United States of America.

*See* Plaintiffs' first Consolidated Complaint, at ¶¶ 34, 35. Eagle's Form 10–KSB reported revenue of $3,354,847, with $2.5 million of the revenue attributed to sales in India. Subsequently, Defendant Damato admitted that Eagle did not have any revenue from Indian operations and that all reports referencing such revenue were false. He also confessed that he forged bank statements and purchase orders to make it appear that Eagle had received revenue from India. The apparent revenue income was merely transferred to Eagle's account from another bank account Defendant Damato controlled in the United States. Defendant Damato also created false purchase orders and gave them to Tanner. Tanner never received original purchase orders from the customers, as required by the Generally Accepted Accounting Standards (GAAS).[1]

---

**1.** *See Kinney v. Metro Global Media, Inc.,* 170 F.Supp.2d 173, 176 n. 2 (D.R.I.2001) ("GAAS are the guidelines issued by the American Institute of Certified Public Accountants which establish the 'criteria for the auditor's examination and required reports.' ")

The SEC filed a lawsuit seeking injunctions against Eagle and Defendant Damato, alleging massive financial fraud and misleading statements regarding non-existent revenue from its Indian operations. Eagle settled the suit by agreeing to the entry of a final judgment of permanent injunction against the company.

The first consolidated complaint alleged violations of the Generally Accepted Accounting Principles (GAAP)[2] against the Defendants generally. Plaintiffs also argued that Tanner committed GAAS violations, alleging that Tanner, *inter alia*, knew or should have known that reports issued by Eagle were false; knew or should have known that the bank statements claiming revenue from Eagle's Indian operations were forged based on the bank code and date format of the statements; failed to exercise due professional care; failed to obtain an understanding of Eagle's control structure such that it could better conduct the audit; and ignored red flags which would have led to the discovery of the fraud.

In its first motion to dismiss, Tanner primarily argued that dismissal was warranted because Plaintiffs' fraud claims failed to allege fraud with particularity and lacked adequate allegations of scienter. Specifically, Tanner averred that Plaintiffs failed to establish that Tanner acted with "severe recklessness." Plaintiffs attempted to show this requisite state of mind through 1) the sheer magnitude of the fraud; 2) numerous red flags; 3) GAAP and GAAS violations; and 4) Defendant's reckless and improper audit.

In making its magnitude of the fraud argument, Plaintiffs mainly relied on the misstated revenue during the Class Period.

However, the Court found that, although the amount of money involved in the fraud was large in proportion to the company's revenue, the opportunity to discover the fraud was relatively small. There was only one account and one client involved, only one fictitious order was created, and the bank statements were forged. In other words, the Court concluded that the magnitude of the fraud was insufficient to establish scienter.

Plaintiffs' alleged red flags were the lack of purchase orders or receipts of revenue from a third party and the lack of credible and complete bank statements. The Court found that these alleged red flags amounted to "fraud by hindsight" and only raised inferences of ordinary negligence. In addition, the Court stated that such red flags amounted to nothing more than GAAS violations. Finally, the Court concluded that the alleged GAAP and GAAS violations, standing alone, were insufficient to establish an inference of scienter.

## B. Changes in the Second Amended Class Action Complaint

Plaintiffs added a substantial amount of information to the Second Amended Class Action Complaint. Most importantly, Plaintiffs elaborated on Tanner's alleged scienter. The *Complaint* now contains additional information on Plaintiffs' claims regarding the magnitude of the fraud and the red flags. For all intents and purposes, the allegations concerning the GAAP and GAAS violations remain the same.

As already mentioned, Plaintiffs relied heavily on the magnitude of the misstated revenue in the first class action complaint.

**2.** *See Kinney,* 170 F.Supp.2d at 176 n. 1("GAAP are the principles issued by the Financial Accounting Standards Board which are recognized by the accounting profession as the 'conventions, rules, and procedures that define approved accounting practices at a particular time.' Financial statements filed with the SEC that are not prepared in compliance with the GAAP are presumed to be misleading and inaccurate.")

However, the Second Amended Class Action Complaint contains much more information regarding the drastic differences between the previously issued financial statements and the restatement. Plaintiffs present the line items from three statements: the income statement, the balance sheet, and the statement of cash flows. In all, 60 of the total 75 line items of these statements were restated.[3]

Specifically, 11 of 16 line items were restated on the income statement. Revenue was restated from $3,354,847 to $857,347 (an overstatement of 291%). Impairment of investments was restated from $201,363 to $ 851,363 (an understatement of 323%). Interest expense was restated from $325,607 to $3,036,034 (an understatement of 832%). Net loss was restated from $5,738,634 to $10,112,219 (an understatement of 43%). Thus, net loss per share was restated from $3.39 per share to $5.97 per share (also an understatement of 43%).

Of the 28 line items on the balance sheet, 19 had to be restated. Cash, which was originally reported at $717,847, was restated as $0 (an overstatement of 100%). Liabilities were restated from $6,916,964 to $10,572,225 (an understatement of 35%). Shareholder equity was restated from $8,331,044 to $ 3,452,459 (an understatement of 141%).

Finally, 20 of the 31 line items in the statement of cash flows had to be restated. This including restating the amount of cash from $717,847 to $0 (again, an overstatement of 100%).

Tanner claims that Plaintiffs have merely attempted to create the "illusion of mag-

nitude of the fraud' " by simply charting the ripple of one fabrication by Defendant Damato regarding the India operations. Because the several line item restatements were the result of this one fabrication, Tanner contends that its opportunity to observe or discover the transaction did not correspondingly increase. Plaintiffs respond that the restatement creates more than the illusion of magnitude of the fraud, as nearly every aspect of Eagle's financial statements was materially affected. Plaintiffs also point out that the restatement encompassed almost every accounting ledger of Eagle, affording Tanner multiple opportunities to discover the fraud.

Plaintiffs also allege that numerous additional red flags existed at the time of the audit. These red flags include the following:

1. Monies received from the purported sales in India were actually transferred from a bank account at the very same bank where Eagle banked;

2. The June 5, 2000 Purchase Order reflected an order for only 650,000 blocks, while the 10–K reported 750,-000 blocks;

3. Bank statements reflecting that the payment from purported sales in India was actually made to an entity that was not a party to the June 5, 2000 Purchase Order;

4. Fifty percent of the payment for the June 5, 2000 Purchase Order was due on delivery, but there is no documentation that delivery was ever made;

5. The License Agreement that Eagle needed in order to manufacture and

---

**3.** The Court notes that there is a discrepancy between the percentages reported in the Complaint and in the Plaintiffs' Response. The Complaint alleges an overstatement of revenue of 343%, while the Response alleges an overstatement of 291%. *See* Complaint at 31; Plaintiffs' Response at 10. In addition, the Complaint alleges an understatement of net loss of 43%, while the Response alleges an understatement of 76%. *See* Complaint, at 31; Plaintiffs' Response, at 10. The numbers quoted above cite the correct mathematical percentage

sell blocks in India was not entered into until two-and-a-half months after the June 5, 2000 Purchase Order (and three weeks after the first 250,000 blocks were purportedly delivered);

6. A Trip Report from Defendant Damato stating that Eagle's India operations were not properly registered and that, to circumvent this problem, Eagle ran two of its purported transactions through an entity that it had previously written off;

7. Financial documentation revealing that the purported sales to India were not arms-length, in that the agent of company ordering the blocks was being paid substantial commissions for the sales while also being employed as the Managing Director of an Eagle subsidiary;

8. The resignation of an Eagle board member due to "the ongoing, and unresolved CTI/Eagle dispute," while CTI was the entity Eagle was using to channel the money from its purported sales in India;

9. Stark differences in the June 5, 2000 Purchase Order and the January 1, 2001 Purchase Order (For example, the January Purchase Order was on the buyer's letterhead, contained specific terms, and was signed by the buyer's agent and Defendant Damato. The June Purchase Order was signed by an unidentified person. Furthermore, the January Purchase Order was for an amount thirteen times greater than the June Purchasing Order.); and

10. Defendant Damato's letter to Eagle's Board of Directors claiming a sale of 750,000 blocks in the fourth quarter, while the June 5 Purchase Order indicated that the sale was actually for 650,000 blocks in the third quarter.

Furthermore, Tanner never received the June 5 Purchase Order from the customer, but instead obtained it from Eagle.

Tanner claims that these "red flags" amount to nothing more than fraud by hindsight and GAAS violations. As such, they are little more than clues which might have alerted Tanner to the fraud. Tanner relies heavily on the fact that there was no "tip-off," such as an employee alerting Tanner to the fraud or an article questioning the finances of the company, indicating that the documents bore further scrutiny. Tanner labels this lack of a tip-off as "a fatal flaw." Plaintiffs argue that the applicability of red flags in demonstrating scienter has never been limited solely to tip-offs and that they are alleging both red flags and GAAS violations. Moreover, Plaintiffs state that the red flags were "glaring" and concerned Eagle's largest contract, which represented over 74% of Eagle's revenues. Taken together, Plaintiffs claim that the red flags were sufficiently attention-grabbing.

As far as the GAAS and GAAP violations are concerned, Tanner does not dispute the alleged violations. Instead, Tanner states that such violations, standing alone, do not amount to the requisite inference of scienter.

## II. Discussion

### A. Applicable Standards of Law

A court should only grant a motion to dismiss for failure to state a claim "when the movant demonstrates 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Harper v. Blockbuster Entertainment Corp.*, 139 F.3d 1385, 1387 (11th Cir.1998) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *see also* Fed.R.Civ.P. 12(b)(6). The complaint need only contain a short and plain statement of the claim showing

that the pleader is entitled to relief. Fed. R.Civ.P. 8(a)(2). In short, the complaint must give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests. *See Conley,* 355 U.S. at 47, 78 S.Ct. 99.

When considering a motion to dismiss, the court must accept the well-pled facts in the complaint as true and construe them in the light most favorable to the plaintiff. *Beck v. Deloitte & Touche, Deloitte, Haskins & Sells, Ernest & Young, L.L.P.,* 144 F.3d 732, 735 (11th Cir.1998). As the Eleventh Circuit has noted, "the threshold of sufficiency that a complaint must meet to survive a motion to dismiss for failure to state a claim is exceedingly low." *In re Southeast Banking Corp.,* 69 F.3d 1539, 1551 (11th Cir.1995) (quotations omitted).

■ Section 10(b) of the Securities and Exchange Act of 1934 makes it "unlawful for any person ... to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commissioner may prescribe." 15 U.S.C. § 78j (1997). Pursuant to this authority, Rule 10b–5 makes it unlawful for any person to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstance under which they were made, not misleading." 17 C.F.R. § 240.10b–5 (1997). The Eleventh Circuit requires a plaintiff alleging securities fraud under Rule 10b–5 to plead 1) a false statement or omission of material fact; 2) *made with scienter;* 3) upon which the plaintiff justifiably relied; 4) that proximately caused the plaintiff's injury." *Robbins v. Koger Properties, Inc.,* 116 F.3d 1441, 1446 (11th Cir. 1997) (emphasis added).

■ Allegations of security fraud under § 10(b) and Rule 10b–5 are subject to the heightened pleading standards of Federal Rule of Civil Procedure Rule 9(b). Rule 9(b) requires that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). The purpose of Rule 9(b) is to "ensure that the allegations of fraud are specific enough to provide sufficient notice of the acts complained of" and to "eliminate those complaints filed as a pretext for discovery of unknown wrongs...." *Anderson v. Transglobe Energy Corp.,* 35 F.Supp.2d 1363, 1369 (M.D.Fla.1999). The Eleventh Circuit has cautioned, however, that "Rule 9(b) must not be read to abrogate Rule 8 ... and a court considering a motion to dismiss for failure to plead fraud with particularity should always be careful to harmonize the directive of Rule 9(b) with the broader policy of notice pleading." *Friedlander v. Nims,* 755 F.2d 810, 813 n. 3 (11th Cir.1985).

■ Generally, in order to survive a Rule 9(b) challenge, the complaint must specify: 1) precisely what statements were made in what documents or oral representations or what omissions were made; 2) the time and place of each such statement and the person responsible for making it (or, in the case of omissions, not making); 3) the content of such statements and the manner in which they misled the plaintiff; and 4) what the defendants obtained as a consequence of the fraud. *Ziemba v. Cascade Int'l, Inc.,* 256 F.3d 1194, (11th Cir. 2001) (citing *Brooks v. Blue Cross and Blue Shield of Florida,* 116 F.3d 1364, 1371 (11th Cir.1997)).

In December 1995, Congress enacted the Private Securities Litigation Reform Act ("PSLRA") which heightens the pleading requirements for Rule 10b–5 claims. The Act goes further than Rule 9(b) by

requiring a complaint alleging fraud to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1).

## B. Scienter

The crux of Tanner's claim is that Plaintiffs have not adequately pled the requisite inference of scienter. Both parties compare their positions to those of parties in previous cases dealing with the heightened pleading standard for scienter. However, the issue of scienter itself is very fact-specific, requiring consideration of each individual factor as well as the context as a whole. Thus, the magnitude of the fraud, the red flags alleged, and the GAAP and GAAS violations should be examined individually, with the context as a whole also playing a role in this Court's consideration. *See In re MicroStrategy, Inc., Sec. Litig.*, 115 F.Supp.2d 620, 649 (E.D.Va.2000) (stating that the individual allegations in the case collectively painted a "compelling picture of scienter" and that the plaintiff must allege facts that place the GAAS violations "in a context that 'paint[s] a portrait of an audit so reckless that a jury could infer an intent to defraud' ").

### 1. Magnitude of the Fraud

A number of decisions cite the magnitude of the fraud in weighing an alleged inference of scienter. *See In re Sunterra Corp. Sec. Litig.*, 199 F.Supp.2d 1308, 1338 (M.D.Fla.2002) (citing *Carley Capital Group v. Deloitte & Touche, L.L.P.*, 27 F.Supp.2d 1324 (N.D.Ga.1998), as stating that "a drastic overstatement" coupled with GAAP violations could be enough to raise the requisite strong inference against an auditor); *In re Sunbeam Sec. Litig.*, 89 F.Supp.2d 1326, 1345 (S.D.Fla.1999) (citing the allegation that the "sheer magnitude of the restatements of Sunbeam's financial statements suggests that Arthur Andersen should have known or was severely reckless not to know that its Unqualified Audit Opinion was misleading"); *Carley Capital,* 27 F.Supp.2d at 1339–40 (holding that the totality and magnitude of that defendant's accounting violations constituted strong circumstantial evidence of reckless or conscious behavior); *In re Sahlen & Assoc., Inc. Sec. Litig.*, 773 F.Supp. 342, (S.D.Fla. 1991) (holding that the allegations, which included the allegation that defendant was at least grossly reckless in failing to discover that nearly two-thirds of the accounts receivable were required to be written off, clearly suggested that the defendant "may have had a strong indication that something was seriously amiss... and certainly provide [defendant] with fair notice of Plaintiffs' claims"); *Kinney,* 170 F.Supp.2d at 180 (stating that the "failure to 'investigate the doubtful' gives rise to a strong inference of scienter, particularly in light of the magnitude of the accounting error involved" and that the magnitude of the reporting errors may lend weight to allegations of recklessness where the defendants are in a position to detect errors); *MicroStrategy,* 115 F.Supp.2d at 636 ("[w]hile alleging a misapplication of Generally Accepted Accounting Principles standing alone is insufficient, such allegation when combined with a drastic overstatement of financial results can give rise to a strong inference of scienter... [and] the totality and magnitude of the ... accounting violations [may] constitute strong circumstantial evidence of reckless or conscious misbehavior.") (citing *Carley Capital,* 27 F.Supp.2d at 1339–40). Plaintiffs also cite the grave magnitude of the fraud in this case in attempting to allege scienter.

Tanner first claims that Plaintiffs' allegations of magnitude of the fraud amount to a mere "illusion." Yet the massive differences between the original statement and the restatement, as already enumerated by the Court, speak otherwise. Tanner would like this Court to think that the restatement was not as drastic as it appears because it simply shows the effects of one fictitious transaction. Yet when this one contract makes up over 74% of Eagle's revenue, the magnitude becomes a little more concrete. This is where a matter of context comes into play. As discussed at the January 9, 2004 hearing, Eagle reported no related transactions in the year before the fictitious transaction. Tanner's counsel did not know how many transactions occurred within the same year as the fictitious transaction. Tanner did not refute this Court when it surmised, based upon the fact that no transactions occurred the year before, that a great number of transactions probably did not occur within the same year as the fictitious transaction. Placed in this context, it appears as though Tanner had relatively few transactions in which to investigate. "The more serious the error, the less believable are defendants' protests that they were completely unaware of [the company's] true financial status and the stronger is the inference that defendants must have known about the discrepancy." *MicroStrategy*, 115 F.Supp.2d at 637 n. 33 (quoting *Rehm v. Eagle Finance Corp.*, 954 F.Supp. 1246 (N.D.Ill.1997)).

Thus, this situation is quite unlike any of the cases cited by the parties. Whereas in those cases the companies involved handled many transactions per year, Tanner did not refute that few transactions occurred during the year of the fabricated transaction. Tanner instead argues that the magnitude of the fraud in this case does not compare to the magnitude in other cases and maintains that Plaintiffs are simply citing to the effects of one

fabrication, whereas previous cases involved numerous accounting manipulations. For example, Tanner states that *Sunbeam, MicroStrategy,* and *In re Livent, Inc., Sec. Litig.,* 148 F.Supp.2d 331 (S.D.N.Y.2001), are distinguishable because the accounting fraud in those cases involved numerous transactions over a period of time. Tanner also claims that *In re First Merchants Corp. Sec. Lit.,* 1998 WL 781118 (N.D.Ill. Nov. 4, 1998), is also distinguishable because it involved an amount of money far larger than the amount at issue in the fraudulent Eagle transaction. Yet the number of transactions and the amount of money involved must be taken in context, as the number of fraudulent transactions in those cases could very well outnumber the total number of transactions Eagle even had during the class period. Tanner had relatively few transactions to investigate. When one of relatively few transactions is fictitious and makes up over 74% of the company's revenue, the opportunity for the auditor to discover the fraud increases, and the magnitude of the fraud gives rise to an inference of scienter.

Some courts have held that a plaintiff, in satisfying the high bar of recklessness, "must prove that the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decision if confronted with the same facts." *In re Raytheon Sec. Litig.,* 157 F.Supp.2d 131, 154 (D.Mass.2001); *Reiger v. Altris Software, Inc.,* 1999 WL 540893, *4 (S.D.Cal. Apr.30, 1999); *First Merchants,* 1998 WL 781118 at *10. *See also MicroStrategy,* 115 F.Supp.2d at 651. In this situation, when the grave overstatements and understatements in the income statement, balance sheet, and statement of cash flows are taken into consideration

with the relatively small number of transactions during the class period and the fact that the one fabricated transaction constituted 74% of the company's business, it does not appear that Tanner conducted any type of audit whatsoever.

It is true, as Tanner points out, that this Court previously stated in its May 15, 2003 Order [DE 84] that, while the amount of money involved in the fraud was large in proportion to the revenue, the opportunity to discover the fraud was relatively small, and thus the magnitude of fraud gives less of an inference of scienter. *See* Order, at 8. The Court focused on the fact that only one account was involved, only one client was involved, and only one fictitious order was created. However, the Complaint now before this Court puts these facts in context. Not only was there only one contract and one client involved, but this contract was only one of a few during the entire class period. Plaintiffs have also pled numerous other facts that shed light on the complete permeation of the company's financial figures by this fraudulent contract.

While the cases cited by Tanner involve multiple transactions, there is nothing in those cases that *requires* more than one transaction in order for the magnitude of the fraud to give rise to the requisite level of scienter. In fact, some decisions indicate that only one transaction is needed in order to effectively plead magnitude of the fraud. *See, e.g., Kinney,* 170 F.Supp.2d at 180 (stating that the more serious *the error,* the less believable are defendants' protests that they knew nothing) (quoting *Rehm,* 954 F.Supp. at 1256); *MicroStrategy,* 115 F.Supp.2d at 639 (stating that "[p]roblems with *a transaction* with a major impact on revenues are more likely to help support a strong evidence of scienter") (citing *Greebel v. FTP Software, Inc.,*

194 F.3d 185, 206 n. 18 (1st Cir.1999)) (emphasis added). Furthermore, some courts have noted that a drastic overstatement coupled with GAAP violations can raise the requisite strong inference against an auditor. *See, e.g., Sunterra,* 199 F.Supp.2d at 1338 (citing *Carley Capital,* 27 F.Supp.2d at 1339).

Although such a drastic overstatement combined with alleged GAAS or GAAP violations may be enough to establish the requisite level of scienter, this Court will nevertheless consider the red flags alleged by Plaintiffs and disputed by Tanner. *See Sunterra,* 199 F.Supp.2d at 1338 (citing *Carley Capital,* 27 F.Supp.2d at 1339).

### 2. Red Flags

Red flags are "those facts which come to the attention of an auditor which would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors." *Sunterra,* 199 F.Supp.2d at 1334. Together with GAAP violations, red flags may be sufficient to establish scienter. *Id.* However, the purported "red flags" cannot consist primarily of re-hashes of the GAAP violations. *Holmes v. Baker,* 166 F.Supp.2d 1362, 1379 (S.D.Fla.2001). In addition, a plaintiff cannot plead scienter merely by alleging "that later disclosed information 'would have been' discovered earlier if the auditor had not violated GAAS," which amounts to fraud by hindsight. *Cheney v. Cyberguard Corp.,* 2000 WL 1140306, *12 (S.D.Fla. July 31, 2000); *Reiger,* 1999 WL 540893 at *8.

Plaintiffs have alleged multiple additional specific red flags, as opposed to the vague red flags of "lack of purchase orders or receipts of revenue from a third party" or "lack of credible and complete bank statements" that they cited in the first complaint.[4] Tanner, however, contends

---

4. The previously-cited red flags amounted to nothing more than conclusory allegations.

*See Sunbeam,* 89 F.Supp.2d at 1346 (discuss-

that these red flags merely amount to GAAS violations and fraud by hindsight. While it may be true that the alleged red flags merely restate the GAAS or GAAP, Tanner has failed to cite to specific provisions and explain how they are being rehashed.[5] In fact, Tanner cites to no GAAS provisions at all. Instead, Tanner submits the blanket assertion that the "red flags" merely amount to GAAS violations. As such, Tanner has failed to show "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *See Harper,* 139 F.3d at 1387; *see also* Fed.R.Civ.P. 12(b)(6). This Court cannot accept the movant's mere allegations as true, especially in light of the fact-specific red flags pled by the Plaintiffs.

▮ Tanner's "fraud by hindsight" argument is equally unavailing. Tanner asserts that the "[d]ocuments Tanner should or could have reviewed to discover the fraud amount to nothing more than fraud by hindsight—not red flags." *See* Tanner's Motion, at 10. It is true that Plaintiffs cannot simply plead "that later disclosed information 'would have been' discovered earlier if the auditor had not violated GAAS." *See Cheney,* 2000 WL

1140306 at *12; *Reiger,* 1999 WL 540893 at *8. But here it appears that Plaintiffs are not pleading that "later disclosed information" would have been discovered earlier, but that information actually disclosed should have been investigated. Indeed, Plaintiffs' "red flags" were not later discovered documents and did not contain later discovered information; rather, the documents and information therein were disseminated and available at the time Tanner was auditing Eagle. In other words, Tanner focuses exclusively on the words "would have been," when the focus in considering fraud by hindsight also includes the phrase "later disclosed information." [6]

For example, the June 5 Purchase Order, reflecting only 650,000 blocks (whereas Eagle represented in its 10–K that 750,000 blocks had been sold), was available at the time of the audit. Plaintiffs are not claiming that this Purchase Order would have been discovered if Tanner had not violated GAAS, but that this Purchase Order, present and available at the time of the audit, should have led Tanner to investigate the discrepancy. This is not fraud by hindsight. This is distinguishable from the situation in *Reiger,* in which the court

ing that the plaintiff in *Zucker v. Sasaki,* 963 F.Supp. 301 (S.D.N.Y.1997), simply made conclusory, fact-deficient allegations). Plaintiffs have now pled numerous fact-specific red flags which point to actual documents and occurrences. As such, the mere allegation that the red flags are restatements of GAAS violations is unavailing.

5. Furthermore, the alleged magnitude in combination with the alleged GAAP and GAAS violations constitute the requisite inference of scienter. *See infra* this Part, section 4.

6. The language used in other court decisions reflects this conclusion that Tanner's emphasis is misplaced. *See, e.g., In re Hamilton Bankcorp, Inc., Sec. Litig.,* 194 F.Supp.2d 1353, 1359 (S.D.Fla.2002) (upholding the

plaintiffs' allegations, including the allegation that the auditor "knew and recklessly disregarded, or was severely reckless in not knowing, of a number of red flags which *would have exposed* the purported fraud") (emphasis added); *Carley Capital,* 27 F.Supp.2d at 1340 (maintaining that the allegations were sufficient to show severe recklessness, including the allegation that the end of quarter revenue manipulations were highly suspicious and that "a prudent auditor *would have been on notice* to inquire further even if it was not directly responsible for the manipulations") (emphasis added); *In re Worldcom Sec. Litig.,* 2003 WL 21488087, *7 (S.D.N.Y. June 25, 2003) (upholding the allegation that, had the auditor reviewed the company's accounting systems and data, "it *would have discovered* the lack of documentation and the fraudulent accounting treatment") (emphasis added).

did find fraud by hindsight. *See Reiger,* 1999 WL 540893 at *7. In that case, the complaint failed to link the financial restatement with any facts *"available during the audit* that could have alerted [the auditor] to the inaccuracies in the information furnished by [the company]." *Id.* (emphasis in the original). Plaintiffs, on the other hand, have pled a significant amount of facts that were available during the audit that *"could have* alerted" Tanner to the inaccuracies. *See id.* (emphasis added).[7]

If it is Tanner's claim that it did not see the Purchase Order during its audit, this Court is led back to the possibility that Tanner's audit resulted in no audit at all. Thus, Tanner is in a bind. If Tanner did not view the Purchase Order for Eagle's single largest contract, the audit could not amount to any audit at all. On the other hand, if Tanner saw the Purchase Order and ignored the discrepancy, that inaction could be considered a red flag. Regardless, it is apparent that the Purchase Order, along with the other alleged red flags, were not later disclosed documents and do not amount to fraud by hindsight.

Tanner also avers that in order to constitute red flags, such allegations require a "tip-off" alerting Tanner to possible company misbehavior. Specifically, Tanner points to the decisions of *Sunbeam, Hamilton,* and *Ziemba.* However, those cases did not involve the magnitude of fraud that is involved here. Certainly when only a few transactions are involved, the red flags are stained more brightly and wave more violently. And as previously stated, the magnitude of the fraud asserted was not as clear in the first complaint as it is in the Complaint at hand. Interestingly, the court in *Ziemba* did not even consider the magnitude of the fraud, which indicates that magnitude was not a factor that had to be weighed in *Ziemba. See generally, Ziemba,* 256 F.3d 1194. Furthermore, none of those cases actually state that a tip-off is "required." *See, e.g., id.,* 256 F.3d at 1210 (considering the lack of "tips" as one element in evaluating the weight of the red flags, but not concluding that such tips are always necessary); *Sunbeam,* 89 F.Supp.2d at 1344–45 (citing to alleged red flags, including an employee tip and a Baron's article, but never stating that such "tip-offs" are required); *Hamilton,* 194 F.Supp.2d at 1358 n. 4 (stating simply that one of the alleged red flags was that a government agency was inspecting the company, but not requiring such a tip-off and in fact not even using the phrase); *see also Sunterra,* 199 F.Supp.2d at 1335 (stating simply that the "additional facts" alleged in Sunbeam "weighed heavily" in favor of scienter, but not claiming that such factors are the only factors that weigh so heavily). For example, the court in upholding the plaintiffs' cause of action in *Sunbeam* actually relies on two previous decisions where a tip-off was not even involved. *See Sunbeam,* 89 F.Supp.2d at 1345–46; *see also In re Leslie Fay Cos., Inc.,* 835 F.Supp. 167, 175 (S.D.N.Y.1993);

---

7. It should be emphasized that the court in *Reiger* also focuses on the timing of the alleged red flags in rendering its finding and actually requires facts that "could have alerted" the company to inaccuracies, whereas Tanner argues that allegations concerning documents that "should or could have" been reviewed automatically result in fraud by hindsight. This argument is inaccurate, as *Reiger* and other decisions demonstrate. *See Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 52 (2nd Cir.1995) ("Mere allegations that statements in one report should have been made *in earlier reports* do not make out a claim of securities fraud.") (citing *Denny v. Barber,* 576 F.2d 465, 470 (2nd Cir.1978)) (emphasis added); *Hockey v. Medhekar,* 30 F.Supp.2d 1209, 1213 (N.D.Cal.1998) (stating that fraud by hindsight results when *"later events* are used to support the falsity of earlier statements") (emphasis added). *See also supra,* note 6.

*Jacobs v. Coopers & Lybrand, L.L.P.*, 1999 WL 101772 (S.D.N.Y. Mar. 1, 1999).

■ In actuality, it appears as though *Kinney* is more in line with the circumstances here. In considering the alleged red flags, the court reflected on their relationship with the magnitude of the fraud in stating that the defendant's "failure to 'investigate the doubtful' gives rise to a strong inference of scienter, particularly in light of the magnitude of the accounting error involved." *Kinney*, 170 F.Supp.2d at 180 (citing *Rehm*, 954 F.Supp. at 1256). Thus, tip-offs are an *element* in considering the weight of the red flags. It is mere common sense that the greater the magnitude of the fraud, the less of a need for a tip-off. Furthermore, simply because a court relies on alleged "tip-offs" to tip the scale in favor of scienter does not mean that such tip-offs are required in every setting.

### 3. GAAS and GAAP Violations

■ Allegations of GAAP and GAAS violations, standing alone, cannot supply the requisite level of scienter for securities fraud claims. *Sunterra*, 199 F.Supp.2d at 1333. Tanner does not attempt to refute the alleged GAAP or GAAS violations. Instead, Tanner insists that because Plaintiffs allegations of magnitude of the fraud and red flags fall short, the lone GAAP and GAAS allegations cannot support scienter. However, as discussed above, Plaintiffs have sufficiently alleged both magnitude of the fraud and red flags. Thus, Tanner's argument that the Complaint should be dismissed based on the GAAP and GAAS allegations alone is unavailing.

### 4. Placing the Factors in Context

■ GAAP and GAAS violations provide evidence of scienter "when accompanied by additional facts and circumstances that raise an issue of fraudulent

intent." *In re Smith Gardner Sec. Litig.*, 214 F.Supp.2d 1291, 1302 (S.D.Fla.2002); *Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F.Supp. 1297, 1313 (C.D.Cal.1996). For example, a "drastic overstatement" combined with GAAP violations can be enough to raise the requisite inference of scienter. *Sunterra*, 199 F.Supp.2d at 1338 (citing *Carley Capital*, 27 F.Supp.2d at 1339). Other factors also include red flags and the magnitude of the fraud. *Hamilton*, 194 F.Supp.2d at 1359–60; *First Merchants*, 1998 WL 781118 at *10. *See also Page v. Derrickson*, 1997 WL 148558, *10 (M.D.Fla. Mar. 25, 1997) (discussing that allegations of departure from GAAP combined with "the fact that the 'defendants were responsible for calculating and releasing the financial information'" tended to support a conclusion that the defendants acted with scienter) (citing *Rehm*, 954 F.Supp. 1246, 1255–56).

■ In other words, context plays a role in determining whether a plaintiff has alleged the requisite level of scienter. Here Plaintiffs have alleged, and Tanner has not denied, GAAP and GAAS violations. In combination with those violations are the alleged magnitude of the fraud and red flags. When the GAAS and GAAP violations are combined with the magnitude of the fraud or red flags alleged in this Complaint, it is apparent that the "factual picture painted by the complaint" reveals allegations providing a sufficient inference of scienter. *See Arnlund v. Deloitte & Touche, LLP*, 199 F.Supp.2d 461, (E.D.Va.2002) (quoting *MicroStrategy*, 115 F.Supp.2d at 631).

### C. Rule 9(b)

■ Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R.Civ.P. 9(b). Tanner asserts that one of

the requisites in pleading under 9(b) is to state what defendants obtained as a consequence of the fraud. Because Plaintiffs have not alleged what, if anything, Tanner obtained as a result of the fraud, Tanner claims the Complaint must be dismissed. Plaintiffs declare that this is not a requirement under Rule 9(b).

As previously stated in this Court's recitation of the applicable standards of law, the fourth element in 9(b) analysis is "what the defendants gained as a consequence of the fraud." Plaintiffs attempt to refute this standard of law in three ways. First, Plaintiffs assert that the proper elements under Rule 9(b) are questions of who, where, when, why, and how. However, the decisions cited for this proposition are from other district courts, while the Eleventh Circuit has specifically stated that a complaint must allege what the defendants gained as a consequence of the fraud. *See Ziemba,* 256 F.3d at 1202; *Brooks,* 116 F.3d at 1371. This Court is subject to the Eleventh Circuit's interpretation of 9(b), and it is not subject to another district court's opinion.

Second, Plaintiffs alleged at the January 9, 2004 hearing that the Circuit Court decision in *Brooks* cited by Tanner actually concerns RICO, and not fraud allegations. However, both *Brooks* and *Ziemba* clearly discuss fraud when listing the elements necessary to satisfy Rule 9(b). *See Ziemba,* 256 F.3d at 1202; *Brooks,* 116 F.3d at 1371.

Third, Plaintiffs allege that motive is not required under 9(b). Yet asserting a motive is quite different from asserting what a defendant actually obtained. One goes to *why* the defendant obtained or tried to obtain something; the other goes to *what* the defendant *actually obtained.* Furthermore, the cases cited by Plaintiffs are clearly discussing the role of motive in scienter and not in regard to Rule 9(b). *See Sahlen,* 773 F.Supp. at 359; *Van de*

*Velde v. Coopers & Lybrand,* 899 F.Supp. 731, 737 (D.Mass.1995).

Because Plaintiffs' Complaint fails to state what Tanner obtained as a consequence of the fraud, it must be dismissed under Rule 9(b).

### D. Dismissal Without Prejudice

Tanner submits that, because Plaintiffs have already been given one chance by this Court to amend the complaint in order to satisfy the strict pleading requirements, the Complaint should be dismissed with prejudice. This Court will not take such a drastic measure, however, when the Plaintiffs have made such drastic strides in complying with the heightened pleading requirements. Therefore, Plaintiffs are granted leave to amend the First Claim for Relief of the Complaint in order to allege what Tanner obtained as a consequence of the fraud.

### III. Conclusion

THIS COURT, after consideration of the motion, the pertinent portion of the record, and the parties' arguments at the January 9, 2004 hearing, and being otherwise fully advised in the premises, does hereby

ORDER AND ADJUDGE that Tanner's Motion to Dismiss [DE 94] the Second Amended Class Action Complaint With Prejudice is GRANTED IN PART and DENIED IN PART. Tanner's motion is granted as to its 9(b) claim, but denied as to its 10b–5 scienter claim. Plaintiffs shall have twenty (20) days from the date of this order to amend the First Claim for Relief.