### In re SPEAR & JACKSON SECURITIES LITIGATION.

No. 04–80375–CIV.

United States District Court,
S.D. Florida.

Oct. 19, 2005.

---

Robert Jeffrey Robbins, Lerach Coughlin Stoia Geller Rudman and Robbins, Boca Raton, FL, Stephen Richard Astley, Jack Reise, Paul Jeffrey Geller, Charles J. Rozenas, Samuel H. Rudman, Cauley Geller Bowman & Rudman, Melville, NY, for plaintiff.

Deborah R. Gross, Bernard M. Gross, Spear & Jackson, Inc., Philadelphia, PA, Stuart L. Berman, Schiffrin & Barroway, Radnor, PA, Allan Michael Lerner, Allan M. Lerner, William Fletcher, Frank Christopher Simone, Craig Barry Sherman, Sherman Law Offices, Fort Lauderdale, FL, Dennis Crowley, Eric Allan Lee, Lee & Amtzis, Boca Raton, FL, for defendant.

John Jacobus, Kenneth J. Vianale, Vianale & Vianale, Boca Raton, FL, consolidated plaintiff.

## ORDER ON MOTIONS TO DISMISS

MIDDLEBROOKS, District Judge.

THIS CAUSE comes before the Court on four separate Motions to Dismiss the Consolidated Class Action Complaint by four separate defendants: Dennis Crowley [**DE** # 66], Spear & Jackson [**DE** # 67], Sherb & Co., LLP [**DE** # 68], and William Fletcher [**DE** # 69]. Also pending before the Court are Plaintiffs' Motion for Clarification [**DE** # 86], Plaintiffs' Motion to Partially Lift Discovery Stay [**DE** # 87], and the Spear & Jackson Corporate Monitor's

Motion to Temporarily Abate the Class Action Litigation. [**DE # 94**]. The Court has reviewed these motions and is otherwise fully apprised in the premises.

## I. PROCEDURAL HISTORY

This class action represents a consolidation of several suits against Spear & Jackson, Inc. (S & J); its former CEO, Dennis Crowley (Crowley); its former CFO, William Fletcher (Fletcher); and its auditor, Sherb & Co., LLP (Sherb). The Plaintiff class, consisting of shareholders who purchased S & J securities between January 30, 2002, and April 16, 2004, accuses the Defendants of violating the Securities Exchange Act of 1934, specifically Sections 10(b) and 20(a) (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b–5 promulgated thereunder (17 C.F.R. § 240.10b–5). A related action brought by the Securities and Exchange Commission (SEC) against Defendants S & J and Crowley, *inter alia*, has been settled. Discovery in the current litigation has been stayed since March 2005 under 15 U.S.C. § 78u–4(b)(3)(B), pending the outcome of the Defendants' Motions to Dismiss.

## II. FACTS

For purposes of a motion to dismiss, the Court accepts all the facts alleged in the Complaint as true.[1] *Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1483 (11th Cir.1994). The Plaintiffs accuse the Defendants of operating a "pump and dump" scheme to inflate S & J's stock price. The Defendants carried out the scheme mainly by filing financial statements that did not comport with Generally Accepted Account-ing Procedures (GAAP) and overstated S & J's operating results. The significant rise in S & J's stock price allowed Crowley, who had surreptitiously acquired 1.2 million shares of S & J in addition to the 6 million shares he had publicly disclosed, to sell off his shares at a great profit.

### A. START OF THE CLASS PERIOD

In January 2002, Crowley began consulting for a company named Megapro. In return for his consulting services, Crowley had 321,000 shares of Megapro stock to his nominee Joseph Cranston. These shares were eventually transferred to Houndstooth, Ltd., an offshore company which Crowley incorporated in the British Virgin Islands in 1998. Crowley acquired 880,000 additional shares of Megapro through several other nominee companies, including Pittsfield Resources Ltd., Northbase Ltd., Bellow Capital Management, Ltd., River Group Holdings, Corp., Rolling Hills Enterprises, Inc., Kidz, Inc., PNC Investments, Inc., and Triton Enterprises.

In February 2002, Crowley retained International Media Solutions ("IMS") to promote S & J stock. During conference calls with IMS sales agents, Crowley claimed that S & J would soon enter into sizable contracts with retailers such as Lowe's, The Home Depot, and Sears.

### B. S & J MERGES WITH MEGAPRO

On September 6, 2002, S & J and Megapro merged. Megapro acquired all of the outstanding stock in S & J, although the surviving entity was still called Spear & Jackson. Crowley became Chairman and CEO of the new S & J. As part of the

---

1. Consequently, the Court will dispense with using the word "allegedly" in the following narration of facts. The facts are taken from the Consolidated Class Action Complaint [DE # 61], filed February 4, 2005.

transaction, approximately 6 million shares of the new company (50% of the total shares outstanding) were issued to PNC Tool Holdings, LLC (PNC). As disclosed in Megapro's 8–K SEC filing in September 2002, Dennis Crowley was the sole owner of PNC. However, Crowley never disclosed the more than 1.2 million additional shares he controlled through the aforementioned nominee companies.

### c. S & J's Financial Statements

On January 13, 2003, S & J filed its Form 10–KSB for the year ending September 30, 2002. In this filing, S & J announced that it was replacing its auditor, BDO Dunwoody, LLP, with Sherb. The filing stated that S & J had a pension liability of approximately $30.7 million. On May 28, 2003, however, the company filed an amended 10–KSB for the 2002 fiscal year. The amended 10–KSB stated that the merger would be accounted for as a reverse acquisition. It restated the previous financial statements based on this accounting change, and stated that the pension now represented a $16.6 million *asset*. The same day, the company filed an amended 10–QSB for the fiscal quarter ending December 31, 2002, which similarly revised financial statements based on the new accounting. Crowley and Fletcher had signed all of these forms, certifying their truth, as required by 18 U.S.C. § 1350.

A July 10, 2003, article on *StockLemon.com* questioned the change in S & J's accounting for its pension plan. The article wondered how the pension plan could swing from a $30 million liability to a $15 million asset and specifically charged that "fuzzy accounting" was the only plausible explanation. Following the *StockLemon.com* article, S & J issued a press release confirming its previous earnings

guidance of $0.16–$0.18 per share for the third quarter. Crowley stated that "Spear & Jackson will reach the $0.16–0.18 per fully diluted share despite the malicious comments on our company," and stated that S & J "denies all recent misstatements, mischaracterizations, and distortions made in recent publications concerning Spear & Jackson." Meanwhile, S & J's stock, which had peaked in late June and early July, declined precipitously in mid-July.

On August 5, 2003, S & J filed a Form 10–QSB for the quarter ending June 30, 2003, which was again signed by Crowley and Fletcher. The following day, S & J issued a press release announcing an earnings increase of 272% over the previous year's first nine months, while net sales had increased 10.6% over the first nine months of 2002. On August 19, 2003, S & J filed an amended 10–QSB, again certified by Crowley and Fletcher. On August 27, 2003, S & J announced the re-purchase of 270,000 of its own shares from an undisclosed shareholder, whom the Plaintiffs claim was Crowley.

On December 30, 2003, S & J announced that it was again restating its year-end 10–KSB for 2001 and 2002. The new amendment again stated the pension as a *liability*, this time of $20 million. The amended 10–K also wrote off $1.1 million in goodwill and declared that its original 2002 10–K had understated the company's loss by 42.8%. Finally, on February 13, 2004, S & J filed a 10–QSB for the quarter ending December 31, 2003. This filing disclosed that the SEC had begun an investigation into S & J and that the company would need to again restate its 10–QSBs for the first three quarters of 2003.

### III. STANDARD FOR PLEADING VIOLATIONS OF SECTIONS 10(b) & 20(a)

A court should only dismiss a complaint if it is clear that "no relief could be grant-

ed under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). However, because the Plaintiffs claim fraud in violation of Sections 10(b) and 20(a) of the Securities and Exchange Act, they must satisfy some additional pleading requirements.

■ Section 10(b) makes it unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Rule 10b–5 prohibits making any untrue statement of material fact or omitting any material fact that would render statements misleading in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b–5. To successfully state a securities fraud claim under Rule 10b–5, a plaintiff must show: (1) a misstatement or omission; (2) of material fact; (3) made with scienter; (4) on which the plaintiff justifiably relied; (5) that proximately caused the plaintiff's injury. *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir.2001).

■ Section 20(a) provides that

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

In order to state a claim under 20(a), the plaintiffs must allege (1) a violation of Section 10(b); (2) that the defendant had the power to control the general business affairs of S & J, and (3) that the defendant had the power to directly or indirectly control or influence the specific corporate policy which resulted in primary liability. *Theoharous v. Fong*, 256 F.3d 1219, 1227 (11th Cir.2001).

■ To survive a motion to dismiss, a claim of fraud must satisfy Federal Rule of Civil Procedure 9(b), which requires that "circumstances constituting fraud or mistake shall be stated with particularity." This requirement is satisfied if the complaint sets forth "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Ziemba*, 256 F.3d at 1202 (quoting *Brooks v. Blue Cross and Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1371 (11th Cir.1997)).

■ Furthermore, the Private Securities Litigation Reform Act of 1995, codified at 15 U.S.C. § 78u–4(b) (hereinafter "PSLRA" or "Reform Act"), specifies heightened pleadings requirements for certain securities actions. This Act imposes two requirements. First, plaintiffs must specify each statement alleged to have been misleading and the specific reason why such statement is misleading. 15 U.S.C. § 78u–4(b)(1). Second, for each alleged misrepresentation, the plaintiff must "state with particularity facts giving rise to a strong inference that the defendant act-

ed with the required state of mind." 15 U.S.C. § 78u–4(b)(2). In this Circuit, the "required state of mind" is at least "severe recklessness." *Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1282 (11th Cir.1999).

## IV. DISCUSSION

The Court will consider each defendant's motion to dismiss in turn.

### A. DENNIS CROWLEY

#### 1. SECTION 10(B)

Crowley argues that Plaintiffs have failed to plead fraud with particularity and that the facts alleged fail to create the strong presumption scienter required by the Reform Act. The Court disagrees.

■ Crowley's argument that Plaintiffs do not plead fraud with particularity clearly fails. The complaint identifies specific statements in specific documents attributable to Crowley and discusses how the statements were misleading and how they benefitted Crowley. The complaint identifies the first amended Form 10–KSB for fiscal year 2002 (filed on May 28, 2003), with its particular statement of a pension *asset* of $16.6 million. The complaint also sets forth 10–QSBs for the first three quarters of fiscal year 2003, all of which contained flawed financial statements, as admitted in S & J's filing on February 13, 2004. The complaint alleges that these filings all misled the plaintiffs by misstating S & J's finances, specifically, overstating earnings and mischaracterizing pension obligations. The complaint also alleges that the misstatements kept S & J's stock price artificially high, allowing Crowley to profit by selling off his shares. Crowley signed a certification for each of these financial statements.

Crowley argues that plaintiffs cannot attribute the misleading statements to him. He cites *Malin v. Ivax Corp.,* 17 F.Supp.2d 1345, 1361 (S.D.Fla.1998) for the proposition that it is insufficient to merely allege that the defendant knew about and benefitted from the scheme. He also argues that the plaintiffs cannot rely on a defendant's position in the company to allege participation in making a statement, citing *Fong,* 256 F.3d at 1225. While both of these abstract statements are correct, their contexts are easily distinguishable from this case. The passage quoted from *Malin* concerned a defendant whom, unlike Crowley, had not signed any of the financial statement on which the fraud claim relied. In *Fong,* the plaintiffs were trying to attribute a paragraph in the company's annual report to Fong simply because he was the CEO. Again, however, Fong had not signed the relevant statement. Here, the Plaintiffs are not relying merely on Crowley's position as CEO to attribute the misleading statements to him. Rather Crowley actually signed the filings.

■ Crowley has a stronger argument that the complaint fails to sufficiently allege scienter. However, this argument also fails. The Reform Act requires that plaintiffs allege facts sufficient to create a strong inference of the required state of mind. 15 U.S.C. § 78u–4(b)(2). The required state of mind includes both intent to deceive and "severe recklessness." *Bryant,* 187 F.3d at 1282. The Eleventh Circuit has defined "severe recklessness" as

> those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standard of ordinary care, and that

present a danger of misleading buyers and sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*McDonald v. Alan Bush Brokerage Co.,* 863 F.2d 809, 814 (11th Cir.1989).

Crowley attacks the sufficiency of the plaintiffs' allegations by examining individual pieces of the complaint and declaring them insufficient for scienter. Specifically, Crowley states that the existence of GAAP violations, Crowley's position with the company, his signing the financial statements, and his "suspiciously timed" stock sales are all individually insufficient to create a strong inference of severe recklessness. However, the inference of scienter can arise from an aggregation of particularized facts, even if each individual fact standing alone does not create a sufficiently strong inference. *Phillips v. Scientific–Atlanta, Inc.,* 374 F.3d 1015, 1017 (11th Cir.2004). The aggregation of the aforementioned facts, with the addition of others in the complaint, gives rise to a sufficient inference of severe recklessness.

In *Druskin v. Answerthink, Inc.,* 299 F.Supp.2d 1307, 1323 (S.D.Fla.2004), the Court listed a number of indicia of fraud that courts had found relevant to finding an inference of scienter in previous cases. The list included (1) suspicious or unusual trading of stock; (2) particularized allegations of profits by virtue of dealing through related companies or exercising stock options; (3) restatements or auditor resignations; (4) allegations that the defendant was confronted with accounting fraud; (5) allegations of "red flags" ignored by the defendants' auditors; and (6) significant price decline following the disclosures at issue. *Id.*

Significantly, almost all of these factors are present in this case. The complaint alleges that Crowley secretly sold off his stock immediately after the company released a quarterly report of enormous earnings increases—a report that was later restated. That this report and sale followed soon after S & J stock had begun to decline in the face of *StockLemon.com's* article questioning the company's accounting only makes the sale more suspicious. Second, there were particularized allegations of profit, specifically that Crowley sold approximately $3 million worth of stock during the class period. Third, S & J has restated both year-end and quarterly reports, most notably the twice-amended fiscal year 2002 10–K, which first stated its pension as a $30 million liability, then a $16 million asset, and then a $15 million liability. As for "red flags," the *StockLemon.com* article at the very least confronted Crowley with the accounting irregularities. However, Crowley chose to immediately deny and denigrate the allegations rather than investigating them. Finally, S & J's stock declined significantly after the *StockLemon.com* article and declined further following S & J's announcement in February 2004 that it needed to restate its financial filings again.

Scienter must be found with respect to each defendant on an individual basis. *Phillips,* 374 F.3d at 1017–18. However, examining the alleged facts with Crowley specifically in mind indicates a strong inference of scienter. Crowley claims that the complaint presents no facts indicating that he knew or should have known the financial statements he signed were false or incorrect. However, the errors, particularly the change in pension status and the overstatement of earnings, were too obvious to ignore. Even assuming Crowley was not intentionally directing the wrongdoing, it stretches the imagination that a CEO would not have been at least suspi-

cious about a $35 million swing in pension status or a 272% increase in earnings (on only a 10% increase in sales). If Crowley had not become suspicious looking over the financial statements before he signed them, he certainly should have suspected problems when *StockLemon.com* raised a significant red flag about S & J's accounting. However, instead of investigating when confronted with the article's allegations, Crowley himself flatly rejected them as "malicious comments" and "misstatements, mischaracterizations, and distortions." The fact that Crowley issued a denial indicates that he was either familiar with the facts or reckless in denying the allegations without sufficient knowledge of the situation. *See In re Sunbeam Sec. Litig.*, 89 F.Supp.2d 1326, 1338 (S.D.Fla. 1999).

Although Crowley's inaction in the face of such suspicious accounting problems alone may not rise to "severe" recklessness, factoring in Crowley's clear motive and opportunity to mislead investors creates sufficient severity. Motive and opportunity alone are insufficient to demonstrate the requisite scienter, but they are relevant as a component of showing severe recklessness. *Bryant*, 187 F.3d at 1285. With his 6,000,000 shares of S & J, not to mention the 1.2 million he allegedly controlled secretly, Crowley clearly had a large stake in keeping S & J's stock price inflated. As chairman, CEO, and majority shareholder, Crowley had the ability to select, or replace, accountants and to review the financial statements. Considering the additional allegations that Crowley had engaged a stock promoter to promote S & J stock even before the merger with Megapro, there are plenty of alleged facts for a strong inference that Crowley had the requisite scienter.

### 2. SECTION 20(A)

Crowley next argues that the Court should dismiss the section 20(a) "controlling person" claim against him because (1) the complaint does not properly state a 10(b)–5 claim, and (2) the complaint contains no allegations that Crowley had control or influence over any specific policy or activity that led to S & J's alleged primary responsibility. The first argument, that the complaint fails to state a 10(b)–5 claim fails, as described above.

Crowley's argument for dismissing the Section 20(a) claims fails as well. Crowley relies on two cases. First he claims that the Court in *Fong* dismissed the 20(a) claims against a CEO because alleging an individual's status as a senior officer is insufficient to establish "controlling person." However, *Fong* actually dismissed the 20(a) claims because the complaint had failed to sufficiently allege scienter for Section 10(b)–5. 256 F.3d at 1227. The opinion makes no further mention of Section 20(a).

Second, Crowley cites *Rosen v. Cascade Int'l Inc.*, 21 F.3d 1520, 1525 (11th Cir. 1994). In *Rosen*, the Court, in a footnote, stated that a plaintiff making a claim under Section 20(a) "must show that the defendant both had actual power or influence over the controlled person (the ability to affect management decisions) and induced or participated in the alleged illegal activity." *Id.* Other courts in the 11th Circuit have held that

> allegations that individuals, because of their management and/or director positions, could control a company's general affairs, including the content of public statements and financial statements disseminated by the company, are sufficient to state a cause of action for controlling person liability.

*In re Hamilton Bankcorp., Inc. Sec. Litig.*, 194 F.Supp.2d 1353, 1360 (S.D.Fla.2002);

*Cheney v. Cyberguard Corp.*, 2001 WL 1916564, *3 (S.D.Fla., Mar.21, 2001); *In re World Access, Inc. Sec. Litig.*, 119 F.Supp.2d 1348, 1358 (N.D.Ga.2000). Here, Crowley was S & J's Chairman, CEO, and majority shareholder. He was quoted in press releases, as alleged in the complaint, and he signed (and thus presumably reviewed) the financial statements. Subsequently, the Plaintiffs have sufficiently pled facts to satisfy Section 20(a).

### 3. FRAUD ON THE MARKETPLACE

■ Crowley's third main argument is that the "fraud on the marketplace" theory, which the Plaintiffs use to show "reliance," is insufficient because the Plaintiffs have not set forth facts supporting their conclusion that S & J stock was traded on an "efficient market." The complaint alleges that S & J was traded on NASDAQ, that the company regularly communicated with public investors through regular press releases and regular public SEC filings. These allegations are sufficient to state a claim relying on an "efficient market" theory. *In re Checkers Sec. Litig.*, 858 F.Supp. 1168, 1177; *In re Rhythms Sec. Litig.*, 300 F.Supp.2d 1081, 1091 (D.Colo.2004).

### 4. AVAILABILITY OF FURTHER DAMAGES

■ Finally, Crowley argues that the issue of damages in this case is moot because Crowley has already disgorged any allegedly illegal profits to the SEC. He argues that allowing the Plaintiffs to recover would be equivalent to allowing impermissible punitive damages. Crowley claims his position is "well established," citing *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb, Inc.*, 734 F.Supp. 1071, 1076 (S.D.N.Y.1990). However, in *Litton* the private plaintiffs were themselves seeking disgorgement of profits. *Id.* In the present case, the Plaintiffs are seeking damages, measured by the difference between the purchase price and the "real" value of the security. *Robbins v. Koger Props.*, 116 F.3d 1441, 1447 (11th Cir.1997). Disgorgement of profits is a different remedy with a different measure (unjust enrichment) from the damages sought by the Plaintiffs. Furthermore, the rule on which Crowley seeks to rely would only make sense if the disgorged profits were necessarily greater than the Plaintiffs' damages. Crowley has not made any attempt to demonstrate this to be the case. Thus, his contention that the Plaintiffs' case is moot in light of the SEC settlement fails.

### B. WILLIAM FLETCHER

■ Defendant Fletcher's Motion to Dismiss, unlike Crowley's, should be granted. The only particularized facts in the complaint that mention Fletcher are those indicating that he signed the company's 10–Ks and 10–QSBs. While the complaint generally avers that Fletcher, by virtue of his position as CFO, had access to and reckless disregarded adverse financial information, the complaint is short on details of Fletcher's specific acts or omissions.

Fletcher did certify the false financial statements, and, as with Crowley, the obviousness of the errors and the "red flag" raised by the *StockLemon.com* article should have prompted Fletcher to at least investigate. However, the motive and opportunity allegations that pushed the claims against Crowley to the level of "severe recklessness" do not apply to Fletcher. The complaint makes no allegation indicating why Fletcher would have participated in the scheme nor how Fletcher

profited from it. The Plaintiffs cite this Court's ruling in *In re Sunbeam* to support the sufficiency of their claim against Fletcher. However, in that case, the complaint specifically alleged the Controller's key role in the fraud and enumerated multiple instances in which the Controller was confronted with concerns over financial statements. Fletcher's position as CFO combined with the obviousness of the accounting errors is perhaps enough to infer gross negligence. However, in this case, without more specific allegations on Fletcher's conduct or motive, the complaint does not sufficiently indicate severe recklessness.

## C. SPEAR & JACKSON

■ Spear & Jackson's Motion to Dismiss should be denied. The crux of S & J's motion, other than arguments dealt with elsewhere, is that Crowley's actions cannot be imputed to S & J itself because Crowley's alleged "pump & dump" scheme was only intended to benefit, and only did benefit, Crowley himself. Plaintiffs counter that S & J did benefit, since the purpose of Crowley's scheme was to inflate S & J's stock price as much as possible.

■ Neither side is able to cite a case directly on point. Courts have uniformly held that acts of a corporate officer that are intended to benefit a corporation to the detriment of outsiders are properly imputed to the corporation. *In re Sunbeam,* 89 F.Supp.2d at 1340. Similarly, knowledge of individuals who exercise substantial control over a corporation's affairs is properly imputable to the corporation. *Id.* (citing *American Standard Credit, Inc. v. National Cement Co.,* 643 F.2d 248, 270–71 & n. 16 (5th Cir.1981)). It is undisputed that Crowley was S & J's Chairman, CEO, and majority shareholder. That Crowley exer-

cised substantial control over the corporation's affairs cannot be seriously challenged.

However, when there is a conflict between the interests of an officer and the interests of the corporate principal, the officer's knowledge is not imputed. *Schoenbaum v. Firstbrook,* 405 F.2d 200 (2d Cir.1968); William Meade Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations,* ch. 11, § 819 (2005). The theory behind this exception is that when an agent's interests are adverse to the principal's, the normal assumption that an agent will communicate his knowledge to his principal does not apply. *In re Bennett Funding Group, Inc.,* 336 F.3d 94 (2d Cir.2003).

There are certainly plenty of 10(b) cases where the CEO's attempts to inflate his company's stock price are imputed to the corporation. *See, e.g., In re Sunbeam,* 89 F.Supp.2d at 1340; *In re Hamilton,* 194 F.Supp.2d 1353. The question is whether the company benefits from the inflated stock price, even if the CEO's motive is purely personal financial gain. Usually, the purpose of inflating the stock price is to help the company gain some sort of competitive advantage, such as improving the likelihood of a merger or increasing access to capital. Still, even these cases undoubtedly include some aspect of personal interest, as in *Sunbeam* where corporate officers seek to protect their reputations and jobs.

Here it is difficult to argue that Crowley's interests were totally adverse to S & J's, or that S & J did not benefit in some way, at least temporarily, from his scheme. While Crowley reaped the primary benefit by selling off his shares, S & J would have enjoyed the benefits of appearing healthy and successful. Furthermore, since Crow-

ley was S & J's majority shareholder, not just its CEO, it is much harder to separate his acts, and his interests, from the company's. Therefore, it is proper to impute Crowley's actions to S & J. Since the Plaintiffs have stated a claim based on Crowley's actions, S & J's motion to dismiss should be denied.

## D. SHERB & CO.

■ Sherb's motion to dismiss should be granted. A brief recitation of the alleged facts pertaining to Sherb's role in the alleged fraud is appropriate. S & J engaged Sherb as its auditor on December 19, 2002; S & J had not consulted with Sherb during at least the previous two years. S & J filed its Form 10–KSB on January 13, 2003, which included an unqualified audit opinion from Sherb dated January 6, 2003. This opinion stated that S & J's consolidated financial statements were presented fairly and in accordance with GAAP. The opinion also stated that Sherb had conducted its audit in accordance with Generally Accepted Auditing Standards (GAAS). Sherb similarly certified the amended 10–KSB filed in May 2003.

The Plaintiffs allege that Sherb violated GAAS by (1) falsely representing that S & J's financial statements comported with GAAP; (2) failing to issue an adverse opinion stating that the financial statements were not fairly presented; (3) not maintaining an independent mental attitude; (4) failing to adequately plan its audit and supervise assistants; (5) failing to exercise professional care; (6) failing to adequately study the existence of internal controls; and (7) failing to obtain a reasonable basis for an opinion regarding the financial statements.

Sherb argues that the Complaint fails to sufficiently allege scienter because it mere-ly lists GAAP and GAAS violations without alleging instances of "red flags" that allow an inference of severe recklessness. The Plaintiffs respond that the magnitude of the alleged violations, as well as red flags including the short time Sherb had to perform its initial audit, S & J's lack of internal controls, and the *StockLemon.com* article, sufficiently support an inference of scienter.

■ Violations of GAAP and GAAS standing alone cannot demonstrate scienter. *Ziemba,* 256 F.3d at 1201. However, courts have considered the magnitude of the violations as a factor weighing in favor of finding scienter. *See In re Eagle Building Tech., Inc. Sec. Litig.,* 319 F.Supp.2d 1318, 1326 (S.D.Fla.2004) (one fraudulent transaction constituted 74% of company's business); *In re Sunbeam,* 89 F.Supp.2d at 1345 (restructuring charge overstated by $90 million); *Carley Capital Group v. Deloitte & Touche, L.L.P.,* 27 F.Supp.2d 1324 (N.D.Ga.1998) (company understated quarterly expenses by $4 million and overstated revenue by $12.5 million).

All of these cases required allegations that the auditor had ignored "red flags," in addition to the seriousness of the alleged errors, to find scienter. Courts within the Eleventh Circuit have considered a wide variety of alleged red flags, including lack of internal controls in the audited company, tip-offs from company employees, publications accusing the company of accounting fraud, knowledge that the company was under financial pressure, and the obvious or basic nature of the fraud. *See In re Sunbeam,* 89 F.Supp.2d at 1344–45; *Cheney v. Cyberguard Corp.,* 2000 WL 1140306 at *12 (S.D.Fla., July 31, 2000); *In re Eagle Building,* 319 F.Supp.2d at 1329. None of these factors are specifically required or dispositive, although some

courts have put particular emphasis on the lack of a tip-off or publication charging fraud. *See Cheney*, 2000 WL 1140306, *12 (distinguishing from *Sunbeam*); *Holmes v. Baker*, 166 F.Supp.2d 1362, 1380 (S.D.Fla. 2001) (distinguishing from *Sunbeam*). Furthermore, each analysis of scienter relies heavily on the overall context. Thus, some courts have accepted a type of red flag as evidence of scienter, while others have rejected the same type of allegation. It is established, however, that the purported red flags cannot simply "re-hash" the alleged GAAP violations. *Holmes*, 166 F.Supp.2d at 1379. Nor may Plaintiffs establish scienter by alleging that the auditor would have discovered the fraud had it not violated GAAS. *In re Eagle Building*, 319 F.Supp.2d at 1328 (citing *Cheney*, 2000 WL 1140306, *12).

The accounting errors in this case were substantial and suspicious. Sherb first certified a Form 10–KSB for fiscal year 2002 stating a pension liability of $30.7 million. Then it certified an amended 10–KSB stating a pension asset of $16.6 million-a swing of over $35 million. The second amended 10–KSB moved the pension back to a $20 million liability. According to the second amended 10–KSB, the first amendment had understated the FY2002 loss by more than 42%.

However, the Plaintiffs have failed to allege sufficient red flags to find Sherb severely reckless. The Plaintiffs present four factors, in addition to the magnitude of error, which they argue are together sufficient to infer scienter. First, the Plaintiffs emphasize that Sherb issued an unqualified audit opinion within two and one-half weeks after being hired. They argue that, because Sherb has such a relatively small staff and S & J has operations in several countries, Sherb was reckless in

not finding that S & J's financial statements violated GAAP. The Plaintiffs argue that "[t]hese allegations clearly demonstrate recklessness and accounting practices that ostensibly amounted to no audit at all." This argument is completely conclusory. The allegation refers only to the first FY2002 10–KSB, which S & J filed in January 2002. However, the Plaintiffs have not specified any particular problem with this filing other than the fact that it was restated later. The allegations of switching the pension value from a liability to an asset and understating the FY2002 loss all compare the second amended 10–KSB to the first amended 10–KSB. All the Plaintiffs are alleging with the regards to the first audit opinion is that it was issued too quickly in violation of GAAS. At most, the relatively short amount of time devoted to the initial audit indicates gross negligence.

The Plaintiffs further argue that the complaint "identifies steps the auditors should have taken to conduct a proper audit," and that had Sherb taken these steps, it would have discovered S & J's GAAP violations. These allegations amount to nothing more than re-hashing violations of GAAP and GAAS. A Plaintiff cannot plead scienter by merely alleging that later disclosed information "would have been discovered earlier if the auditor had not violated GAAS." *In re Eagle Building*, 319 F.Supp.2d at 1328 (citing *Cheney*, 2000 WL 1140306, *12). Again, all the Plaintiffs are alleging is that Sherb was negligent in violating GAAS.

Third, Plaintiffs assert that the complaint demonstrates that S & J was "utterly void of internal controls." Plaintiffs argue that the lack of internal controls would inhibit Sherb's ability to effectively audit S & J and constitutes a red flag

which Sherb ignored. This Court, among others, has cited a lack of internal controls as a red flag contributing to scienter. *In re Sunbeam*, 89 F.Supp.2d at 1344. However, the Complaint only provides conclusory and circular allegations of a lack of internal controls. The Plaintiffs cite several complaint paragraphs to support their "no internal controls" allegation, but these paragraphs only generally aver that internal controls did not exist. The closest the Complaint comes to alleging proof of a lack of internal controls is that GAAP errors occurred. By contrast, when the Court in *In re Hamilton Bankcorp* relied on lack of internal controls as one of many red flags to find scienter, the plaintiffs had alleged nineteen specific problem areas, supported by a separate report. 194 F.Supp.2d at 1359.

Finally, the Plaintiffs' strongest, and perhaps only legitimate, red flag is the *StockLemon.com* article questioning S & J's accounting following the first amended 10–KSB. The Plaintiffs argue that the article makes this case like this Court's decision in *Sunbeam* and distinguishes it from other cases in which the auditor's scienter was lacking. *See Cheney*, 2000 WL 1140306 at *12; *Holmes*, 166 F.Supp.2d at 1380.

However, *Sunbeam* is distinguishable. First, the *Barron's* article in *Sunbeam* was only one of several factors suggesting recklessness, including a tip-off directly from a Sunbeam employee to the auditor and more specific allegations of ignoring internal controls than are present in this case. Second, the allegations in *Sunbeam* contained specific allegations regarding Arthur Andersen's response, or lack thereof, to the *Barron's* article. In *Sunbeam*, Arthur Andersen specifically allowed Sunbeam to declare that the auditor was

standing by its previous audit opinions despite the article. In this case, there are no specific allegations as to what Sherb did or did not do in response to the *StockLemon.com* article. In fact, whereas the Complaint establishes that Crowley and S & J knew about the article (because they responded to it), there are no allegations to suggest that Sherb even knew about the article. Whereas one could assume that a publication in a well-known magazine such as *Barron's* would draw the auditor's attention, one could not make the same assumption about an article on a website like *StockLemon.com*. Without such specific allegations, and without other legitimate red flags to support an inference of severe recklessness, the mere existence of the *StockLemon.com* article is insufficient to establish scienter.

## V. MOTION TO ABATE THE LITIGATION

On September 16, 2005, Soneet Kapila, the Court-appointed Corporate Monitor for S & J, filed a motion asking the Court to temporarily abate this litigation for six months pending the administration of the SEC Restitution Fund established following the SEC's related litigation against Crowley, S & J, and others. Kapila argues that distribution of the Restitution Fund could make many of the class members whole and subsequently moot this litigation. Kapila further argues that a stay could only help all parties involved, since minimizing the attorneys fees which S & J is spending in the current litigation will benefit the class plaintiffs who are S & J shareholders. The Plaintiffs oppose the abatement, arguing, *inter alia*, that the disgorgement remedy in the SEC litigation is different from the damages sought

here. They also argue that there is little reason to believe that the disgorgement fund will fully compensate the plaintiff class.

Abating the litigation is inappropriate at this time. As described in Part IV(A)(4) above, the disgorgement from the SEC action is a separate remedy, calculated differently, from the damages sought here. There is no reason to delay this litigation any further. By the time this case goes to trial, the SEC will have had plenty of time to administer Fund. If the Defendants can credibly argue that the Fund has adequately compensated the Plaintiffs, they may do so at that time.

## VI. TRIAL SCHEDULE

Plaintiffs filed a Motion for Clarification asking that the Court modify its Order dated June 3, 2005 [DE # 84]. That order granted, in part, the parties' Joint Motion to Change Pretrial Schedule. The Court denied the parties' request for an additional year of discovery but granted a stay of discovery, pursuant to 15 U.S.C. § 78u–4(b)(3)(B), while motions to dismiss remained pending. The motions to dismiss adjudicated in this order were filed on March 7, 2005. The Pre–Trial Scheduling Order [DE # 19] had set the discovery cut-off for April 4, 2005. Thus, the parties had one month of discovery remaining when the stay took effect.

In their Motion for Clarification, the Plaintiffs argue that an earlier motion to dismiss by Sherb, filed on November 18, 2004, also had triggered a stay of discovery which remained in effect until that motion was denied as unripe on January 12, 2005 [DE # 58]. Thus, Plaintiffs argue that there were actually three months of discovery remaining when the current mo-

tions to dismiss were filed. However, the November 18 motion to dismiss from Sherb had been filed after the Court had granted permission to the Plaintiffs to file an amended consolidated complaint and before that amended complaint had been filed. As the Plaintiffs themselves argued in opposition to Sherb's motion, the motion to dismiss was a nullity, having been filed against a complaint in a case which had already been closed and consolidated into the current action. Furthermore, no party came forward to request a stay of discovery in connection with the November motion to dismiss. Thus, there was no stay in place following Sherb's November motion.

The Court will, however, grant an additional month of discovery on top of the one month remaining when the current motions to dismiss were filed. The cut-off for discovery will now be **December 19, 2005.** Pre-trial motions will be due by January 6, 2006, and the case will be reset for trial for the two-week period beginning March 6, 2006. It is hereby

**ORDERED AND ADJUDGED** that Defendant Dennis Crowley's Motion to Dismiss [**DE # 66**] is **DENIED.** This case remains pending as to Defendant Crowley.

**ORDERED AND ADJUDGED** that Defendant Spear & Jackson's Motion to Dismiss [**DE # 67**] is **DENIED.** Plaintiffs Motion for Permission to File Sur-reply [**DE # 83**] is **DENIED AS MOOT**. This case remains pending as to Defendant Spear & Jackson.

**ORDERED AND ADJUDGED** that Defendant Sherb & Co., LLP's Motion to Dismiss [**DE # 68**] is **GRANTED.** All claims against Sherb & Co., LLP are **DIS-MISSED**.

**ORDERED AND ADJUDGED** that Defendant William Fletcher's Motion to

Dismiss [DE # 69] is **GRANTED**. All claims against William Fletcher are **DISMISSED**.

It is further **ORDERED AND ADJUDGED** that Plaintiffs' Motion for Partial Lift of Discovery Stay [DE # 87] is **DENIED AS MOOT**. Since the Motions to Dismiss are no longer pending, the Discovery Stay is **LIFTED**.

It is further **ORDERED AND ADJUDGED** that the Corporate Monitor's Motion to Abate [DE # 94] is **DENIED**.

Finally, it is **ORDERED AND ADJUDGED** that Plaintiffs' Motion for Clarification [DE # 86] is **DENIED**. The new cut-off for discovery in this case is **December 19, 2005**. All pretrial motions must be filed by **January 6, 2006**. This case is now **RE–SET** for trial for the two-week period beginning **March 6, 2006** in West Palm Beach, Florida.[2] Calendar call is **RE–SET** for **March 1, 2006**, at 1:15 p.m. in West Palm Beach.

---

**2.** The location of both the trial and calendar call is subject to change, pending the renovation of the West Palm Beach courthouse.